**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION D/B/A PHC CALIFORNIA,<br><br>             Plaintiff,<br><br>    v.<br><br><br>CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES and MICHELLE BAASS,<br><br>           Defendants. | Case No.:  2:22-cv-06636-MEMF (Ex)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 14]** |

      Before the Court is the Motion for Preliminary Injunction filed by Plaintiff, AIDS Healthcare Foundation d/b/a PHC California.  ECF No. 14.  The Court held oral argument on this matter on November 10, 2022.  For the reasons stated herein, the Court hereby GRANTS the Motion for Preliminary Injunction.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **BACKGROUND**

### I.     Factual Background[1]

Plaintiff AIDS Healthcare Foundation d/b/a PHC California ("AHF") is a California non-profit organization headquartered in Los Angeles County.  Compl. ¶ 8.  AHF "is the world's largest provider of health care services to people living with Human Immunodeficiency Virus ("HIV") and/or [Acquired Immunodeficiency Syndrome ("AIDS").]"  *Id.*[2]  Defendant Department of Health Care Services ("DHCS" or "the Department") is a state governmental agency that oversees California's federal Medicaid program ("Medi-Cal").  *Id.* ¶ 11; Declaration of Rafael Davtian ¶ 3.  Defendant Michelle Baass is the Department's Director.  Compl. ¶ 11.

#### A.     Overview of Medi-Cal and the Department's Administration of Medi-Cal Benefits

In 1965, "Congress created the Medicaid program [which] authorizes federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Pharm. Research and Mfrs. Of Am v. Wash*, 538 U.S. 644, 650–51 (2003); *see also* 42 U.S.C. §1369a.  "The federal Medicaid program is administered in California by DHCS as the California Medical Assistance Program, also known as 'Medi-Cal' in accordance with [the California] Welfare and Institutions Code section 14000 *et seq.*"  Declaration of Rafael Davtian ¶ 2.  Approximately thirteen million Medi-Cal beneficiaries are enrolled in a Medi-Cal managed care plan ("MCP").  *Id.* ¶ 3.  "MCPs provide services to Medi-Cal beneficiaries through at-risk contracts entered into with the State."  *Id.*

---

[1] The following facts are taken from AHF's Complaint and the declarations, and other evidence submitted by each party.  *See* ECF No. 1 ("Complaint" or "Compl."); ECF No. 14-2 ("Declaration of Michael Weinstein"); ECF No. 14-3 ("Declaration of Donna Stidham"); ECF No. 14-4 ("Declaration of Michael B. Wohlfeiler"); ECF Nos 14-5, 14-6 ("Declaration of Andrew F. Kim in support of Plaintiff's Request for Judicial Notice" or "Pl.'s RFJN"); ECF No. 19-1 ("Declaration of Rafael Davtian"); ECF No. 19-2 ("Declaration of Michelle Retke"); ECF No. 20 ("Defendant's Request for Judicial Notice" or "Def.'s RFJN"); ECF No. 22 ("Plaintiff's Supplemental Request for Judicial Notice" or "Pl.'s Supp. RFJN"), Ex. 9.  Unless otherwise indicated, the following facts appear to be undisputed.

[2] HIV is a virus that can cause AIDS and other life-threatening complications and death.  Declaration of Michael Weinstein ¶¶ 13, 14; Declaration of Donna Stidham ¶¶ 13, 14; Declaration of Michael B. Wohlfeiler ¶ 8.

As part of its administration, the Department contracts with MCPs to provide covered Medi-Cal services to enrolled members within a county or region, "in exchange for an actuarially certified, per-member monthly capitation payment." Declaration of Michelle Retke ¶ 2. The Department oversees MCPs in accordance with federal and state Medicaid law. *Id.* "Each MCP contracts with its own provider networks and organized systems of care to provide services to its enrolled members." *Id.* Coverage provides "payment of health care services covered under the federal Medicaid program, the state Medi-Cal program, and additional services covered pursuant to the MCP contract." *Id.*

> **B.      AHF's Positive Healthcare Special Needs Plan**

AHF is a non-profit organization that originally started with "the mission to provide Los Angeles residents afflicted with AIDS a place and means to die with dignity." Declaration of Michael Weinstein ¶ 3. AHFs mission progressed over time and now it seeks to "provide cutting edge medical care to people living with HIV/AIDS regardless of their ability to pay with the goals of saving the lives of as many people living with HIV/AIDS as possible and ending the HIV/AIDS epidemic." *Id.* ¶ 4. In "furtherance of this mission, AHF provides medical care" and services to "more than 1.6 million patients in 45 countries" across the world. *Id.*

AHF is under a managed care contract, through which the Department contracts with AHF to provide health care benefits and services to Medi-Cal beneficiaries with AIDS under AHF's Positive Healthcare ("PHC") Special Needs Plan.[3] *Id.* ¶ 5; Declaration of Michael Weinstein ¶ 6. Through the PHC Special Needs Plan, AHF furnishes healthcare benefits and services to those enrolled in the plan ("enrollees"), all who have been diagnosed with AIDS, in exchange for "an actuarially certified, per-member monthly capitation payment" from the Department. Declaration of Michael Weinstein ¶ 6; Declaration of Michelle Retke ¶ 5. Around September and October of 2022, AHF had approximately 800–811 PHC enrollees in its PHC Special Needs Plan. Declaration of Michael Weinstein ¶ 9; Declaration of Donna Stidham ¶ 9; Declaration of Michelle Retke ¶ 5.

---

[3] Also referred to as "PHC California". *See* Declaration of Michelle Retke ¶ 10, Ex. 2; Pl.'s RFJN, Ex. 7

AHF's PHC Special Needs Plan's specialized services and benefits include access "to a team of healthcare professionals—specialized Registered Nurse care managers, expert HIV primary care physicians, Registered Nurses, licenses practical nurses, mental health professionals, social workers, and others[.]"  Declaration of Michael Weinstein ¶ 15; Declaration of Donna Stidham ¶ 15; Declaration of Michael B. Wohlfeiler ¶ 8.  The PHC Special Needs Plan also focuses on strictly scheduled drug regimens, including anti-retroviral drugs, and the interactions between enrollees and "PHC expert service providers" to ensure each enrollee receives the information and care necessary.  Declaration of Michael Weinstein ¶ 15; Declaration of Donna Stidham ¶ 15; Declaration of Michael B. Wohlfeiler ¶ 6.  Most importantly to AHF, the PHC Special Needs care model assigns a professional Registered Nurse care manager to every enrollee.  Declaration of Michael Weinstein ¶¶ 12, 19.  Each assigned Nurse care manager "carefully monitors the care plan established by each [enrollees'] primary care physician, answers healthcare questions" and "develops an integrated care plan," among other things, for enrollees.  Declaration of Michael Weinstein ¶ 19; Declaration of Donna Stidham ¶ 20.  No other Medi-Cal based program in Los Angeles County provides a similar Registered Nurse care manager for all its enrollees living with AIDS.  Declaration of Michael Weinstein ¶ 19.

**C.    The Deterioration of the Parties' Relationship**

According to the Department, the parties' initial primary contract governing the PHC Special Needs Plan was executed in 2011, and proscribed a term of four years from January 1, 2012 to December 31, 2016.  Declaration of Michelle Retke ¶ 6, Ex. 1.  Thereafter, the Contract has been amended and the terms extended.  *Id.* ¶ 7.[4]

According to the Department, AHF was a difficult MCP to oversee.  Declaration of Michelle Retke ¶ 9.  The Department claims that AHF "requested to expand their eligible beneficiary definition[,] . . . resisted DHCS initiatives, demanded higher rates for its services, and repeatedly

---

[4] The parties agree that there are at least three separate agreements that collectively govern their relationship.  *See* Declaration of Michelle Retke ¶¶ 7–8; Pl.'s RFJN, Exs. 1–3.  For the purposes of this Motion, each party refers to these agreements collectively as the "Contracts" or "Contract."  ECF No. 14-1 ("Motion" or "Mot.") at 8; ECF No. 19 ("Opposition" or "Opp'n") at 5 n. 1.  Following suit, the Court will refer to the agreements collectively as the "Contract".

threatened DHCS with political retribution and litigation." *Id.*  The relationship truly soured in the Fall of 2021.

On September 20, 2021, an individual at AHF sent an email to the Department stating:

> As you may know from previous discussions, PHC California is operating at a loss with no path to break even or profitability with the rates AHF is receiving from DHCS. After much internal discussion and actuarial review, AHF's Senior Management has made the decision to terminate the MCP contract with the State effective 1/1/2022. What is the process to effect a termination? Ideally, we'd like to have notice to all enrollees by the end of September. Is there a model notice for this?

Declaration of Michelle Retke ¶ 10, Ex. 2.  This was concerning for the Department because transitioning members from one plan to another can take up to six months, and AHF's notice would only provide the Department three months to accomplish a transition.  *Id.* ¶ 11.

Following AHF's email, on October 6, 2021, representatives for the Department and AHF met to discuss AHF's financial concerns and AHF's demand for higher rate reimbursement for 2022.  *Id.* ¶ 13.  According to the Department, the parties agreed to continue discussions to resolve AHF's financial concerns and on October 27, 2021, the Department sent AHF draft amendments to the Contract extending the terms through December 31, 2022.  *Id.*

Unbeknownst to the Department, on November 12, 2021, AHF sent out a letter to PHC enrollees.  Pl.'s RFJN, Ex. 7 ("Nov. 2021 Letter").  Because the entire dispute revolves around this communication, the Court will republish the letter here in its entirety.

> Dear Member:
>
> AIDS Healthcare Foundation (AHF) is always here to serve your healthcare needs under all circumstances. We are writing to tell you that PHC California, the Medi-Cal health plan which is operated by AHF, ***may*** sunset on December 31, 2021**. If this letter causes you any confusion, please call us right away at 1-800-263-0067 (TTY users call 711).**
>
> We want to assure you that AHF will continue trying to work with the California Department of Health Care Services (DHCS) towards a solution for PHC California members so you can continue to see your doctor and enjoy the benefits that the health plan offers you now. But if PHC California does end, you may receive a letter from DHCS telling you that PHC California will no longer be available to Medi-Cal beneficiaries and current PHC California members after December 31,

2021. The letter will also explain that you will have to choose how you will receive your healthcare after December 31. In the letter, DHCS may limit your choices to other Medi-Cal managed care plans.

**We suggest that you remain in PHC California until December 31, 2021. If PHC California ends, you can choose LA Care or HealthNet for your healthcare starting January 1, 2022. With those plans, you can continue to see your AHF Healthcare Center doctor. However, you will lose your Registered Nurse Care Team Manager and the Health and Wellness benefit, because these benefits are available only through PHC California.**

Twenty-seven years ago, AHF started the then-called Positive Healthcare plan, with the sole purpose of improving the quality of Medi-Cal beneficiaries' healthcare and giving them better access to the doctors they need to see. PHC California works to keep its members as healthy as possible by assigning each member a Registered Nurse Care Team Manager who helps coordinate care. PHC California also offers members a health and wellness benefit such as a no-cost gym membership or over-the-counter pharmacy products. These benefits are not available through other Medi-Cal managed care plans or Regular Medi-Cal (fee-for-service).

In recent years, in spite of AHF's best efforts, DHCS has been unable to offer AHF rates that are enough to cover the healthcare costs of PHC California members. The rate is less than what PHC California pays to doctors and providers for the healthcare you receive. In other words, DHCS expects AHF to cover a substantial part of your healthcare out of its own pocket. AHF is a non-profit organization and cannot afford to privately fund the healthcare of PHC California members.

The operation of PHC California is under a contract between DHCS and AHF. That contract is set to expire on December 31, 2021. Unless DHCS acts quickly before the end of the year, AHF will not be able to renew this contract and PHC California will shut down after 27 years of operation.

We want to assure you that we remain committed to finding a solution with DHCS. We also know that the state of California has experienced several years of continuous budget surpluses, with another surplus protected for 2022. To us, it is unthinkable that in spite of these surpluses, DHCS would not be able to timely accommodate PHC California's best efforts for basic financial survival. DHCS's inability to increase our rates effectively cuts into our members' healthcare services today. And we truly believe that this will add to California's long-term healthcare costs, because studies have shown time and again that those who have less access to healthcare now tend to get sicker and need more and expensive care later.

If you would like to let DHCS know how you feel about its decision not to adequately fund PHC California, you can call the DHCS Office of the Ombudsman at **1-888-452-8609** or email **mmcdombudsmanoffice@dhcs.ca.gov**. You can also call or write to the DHCS Director:

**Call:**     **1-800-541-5555**
**Write:**    **Michell Baass, Director**

**California Department of Health Care Services**
**P.O. Box 997413, MS 0000**
**Sacramento, CA 95899-7413**

Pl's RFJN, Ex. 7 (emphasis in original).

The Department was unaware this letter was sent, until an AHF lobbyist informed it that "AHF . . . sen[t] notices to beneficiaries . . . advising them that the Positive Health Care plan will sunset at the end of the contract on December 31, 2021." Declaration of Michelle Retke ¶ 14, Ex. 11. Under the Contract, AHF is to obtain the Department's approval before sending certain "member information" to members. *Id.* ¶¶ 15–16, Ex. 9. According to the relevant terms, "[m]ember information shall include the Member Services Guide, provider directory, significant mailings and notices, and any notices related to Grievances, actions, and Appeals." *Id.*, Ex. 9, Sixth Amendment to Primary Contract, Ex. A, Att.13, Provs. 4(D); Pl.'s RFJN., Ex. 3 (referred to as Contract 11-88286 A 10 (the "Bridge Contract") §XVII, Ex. A, Attach. 13). The Contract also requires that a Contractor "ensure Medi-Cal Members are notified in writing of any changes in the availability or location of Covered Services, or any other changes in information listed in 42 CFR 438.10(g)" and that such notification "be presented to and approved in writing by DHCS prior to its release." Declaration of Michelle Retke ¶ 15, Ex. 9, Sixth Amendment to Primary Contract, Ex. A, Att.13, Provs. 5(A); Pl.'s RFJN, Ex. 1 (referred to as Contract 11-88286 (the "Primary Contract"), Ex. A, Att. 13).

Pursuant to these provisions, the Department informed AHF that its letter breached certain provisions of their Contract. Declaration of Michelle Retke ¶¶ 15–18. On November 15, 2021, the Department also requested that AHF send it a copy of the letter and draft a retraction and that its failure to do so would constitute an additional breach of the Contract. *Id.* ¶ 18. These requests were made again on November 19, 2021. *Id.* According to the Department, AHF did not send a copy of the letter or a drafted retraction. *Id.* Michelle Retke declared that she had not seen the letter until AHF attached it as an exhibit to the instant motion. *Id.* ¶ 19. Despite these alleged breaches, on December 21, 2021, AHF and the Department reached an agreement and executed amendments to the Contract extending its terms through December 31, 2022. *Id.* ¶ 20. According to the

1    Department, it agreed to an extension to "ensure that AHF's members did not experience an extreme

2    disruption in their care." *Id.*

3         Then, in 2022, due to what the Department considered "serious breaches of its Contracts in

4    sending a notice of expiration to its members without" the Department's approval, AHF's refusal to

5    remedy those breaches, and the "history of difficulties" the Department had with AHF—it was

6    decided that the Department would not extend AHF's Contract past December 31, 2022. *Id.* ¶ 21.

7    On June 30, 2022, the Department sent AHF a Notice of Expiration informing AHF that the

8    Department is declining to exercise its option to extend the term of the Contract. *Id.* ¶ 22, Ex. 5.

9         Thereafter, on August 29, 2022, California State Senator, the Honorable Sydney Kamlager,

10   wrote a letter to the Department on behalf of the Los Angeles County Delegation.  Pl.'s RFJN, Ex. 5.

11   Senator Kamlager expressed that the Los Angeles County Delegation was "deeply dismayed" about

12   the Department's decision to terminate the agreement regarding the PHC Special Needs Plan. *Id.*

13   The letter also presented the Department with several questions related to its decision.  *Id.*  On

14   September 8, 2022, the Department's Director and Defendant, Michelle Baass, responded to Senator

15   Kamlager's letter.  *See* Pl.'s RFJN, Ex. 6.  In response to the question "[u]nder what conditions or

16   circumstances was the contract terminated?" Defendant Baass stated that:

17

18        [L]ast fall, AHF engaged in inappropriate negotiation tactics, including sending
          unapproved notices to their members without obtaining pre-approval of those

19        notices from DHCS. The presumed intention of those notices was to make AHF
          members think that they would soon lose their care manager and services from AHF

20        and cause members to contact DHCS in protest. Despite DHCS' warnings that AHF
          would be in contract violations if they sent notifications to their members and/or

21        terminated their contract unilaterally, they sent members notices on November 12,
          2021, without DHCS approval . . . . Therefore, DHCS determined that it would be

22        in the best interest of members to allow the current contract to expire and to transfer
          members to another Medi-Cal MCP based on their choice.

23

24

25   *Id.*  Defendant Baass further explained that "AHF's willingness to put members in the middle of

26   negotiations with false statements and scare tactics led DHCS to believe that AHF would not be

27   willing to continue in good faith as a plan partner and may again employ such tactics."  *Id.*

28   / / /

8

1

    **D.**    **Administrative Agency and Writ of Mandate Proceedings**

2

    On July 8, 2022, AHF filed a Notice of Dispute challenging the Department's decision to let the

3

Contract expire.  Declaration of Michelle Retke ¶ 23, Ex. 6.  The Department denied AHF's claims

4

and AHF appealed this decision to the Department's Office of Administrative Hearings and Appeals.

5

*Id., see also id.*, Ex. 7.  A hearing on AHF's appeal was scheduled for November 30, 2022.  *Id.* ¶ 23;

6

Def.'s RFJN, Ex. B.  This hearing was vacated due to discovery disputes and as of November 2,

7

2022, a new hearing date has not been set.  Pl.'s Supp, RFJN, Ex. 9.  Michelle Retke, as the

8

Contracting Officer, has since issued a decision stating that "DHCS's contractual dispute process is

9

not the proper forum to decide questions of constitutionality." ECF No. 27 ("Pl.'s Notice and Update

10

of Developments in Plaintiff's State Court Action and Underlying Administrative Proceeding"), Ex.

11

1 at 2.

12

    In addition to filing an appeal with the Department, AHF has also filed a Petition for Writ of

13

Mandate in the Sacramento County Superior Court.  Def.'s RFJN Ex. D.  In this proceeding, AHF

14

raises issues arising under the Contract and seeks a peremptory writ of administrative mandamus and

15

preliminary and injunctive relief enjoining the Department from terminating "the Contracts or

16

otherwise allowing them to lapse[.]"  *Id.* at 17.  On November 16, 2022, the Sacramento County

17

Superior Court denied AHF's Ex Parte Application for Stay of Administrative Decision. ECF No. 26

18

("Def.'s Notice and Update of Developments in Plaintiff's State Court Action"), Ex. 1.

19

    **II.**    <u>**Procedural History**</u>

20

    On September 16, 2022, AHF filed a Complaint in this Court against the Department and

21

Defendant Baass, asserting six causes of action: (1) Violation of United States Constitution,

22

Amendment I—Free Speech; (2) Violation of United States Constitution, Amendment I —Right to

23

Petition; (3) Violation of United States Constitution, Amendment I —Retaliation; (4) Violation of

24

Article 1, Sections 2(a) of the California Constitution—Free Speech; (5) Violation of Article 1,

25

Sections 3(a) of the California Constitution—Right to Petition; (6) Violation of Article 1, Sections

26

2(a) and 3(a) of the California Constitution—Retaliation.  *See generally* Compl.

27

    On October 4, 2022, AHF filed the instant Motion.  AHF seeks an order "prohibiting and

28

forbidding Defendant[s] from terminating, or refusing to amend or extend, the PHC Special Needs

1  Plan based on the exercise by AHF and/or PHC Enrollees of constitutionally protected rights."  Mot.

2  1–2, 20.  Defendants filed an Opposition on October 20, 2022.  AHF filed its Reply on October 27,

3  2022. ECF No. 21 ("Reply").  A hearing on the Motion was held on November 10, 2022.

**REQUESTS FOR JUDICIAL NOTICE AND EVIDENTIARY OBJECTIONS**

I.      **Applicable Law**

A court may take judicial notice of facts not subject to reasonable dispute where the facts "(1)
[are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and
readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID.
201(b).  Under this standard, courts may take judicial notice of "*undisputed* matters of public
record," but generally may not take judicial notice of "*disputed* facts stated in public records."  *Lee
v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith
v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002).  The Ninth Circuit has recognized
public records, including documents on file in federal or state court, are appropriate for judicial
notice.  *See, e.g.*, *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132–33 (9th Cir. 2012); *United States
v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007).  "Matters of public record" also include records from
administrative proceedings.  *United States v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547
F.3d 943, 955 (9th Cir. 2008).

> The purpose of a preliminary injunction is merely to preserve the relative positions
> of the parties until a trial on the merits can be held. Given this limited purpose, and
> given the haste that is often necessary if those positions are to be preserved, a
> preliminary injunction is customarily granted on the basis of procedures that are
> less formal and evidence that is less complete than in a trial on the merits. A party
> thus is not required to prove his case in full at a preliminary-injunction hearing.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  "The urgency in obtaining a preliminary

injunction necessitates a prompt determination and makes it difficult to obtain affidavits from

persons who would be competent to testify at trial.  The trial court may give even inadmissible

evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."

*Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (considering hearsay evidence).

/ / /

II.   **Discussion**

A.   **AHF's Requests for Judicial Notice**

AHF requests this Court take judicial notice of several exhibits.  *See* Pl.'s RFJN Exs. 1–8; Pl.'s Supp. RFJN, Ex. 9–10.  The Court will address the exhibits in turn.

Exhibits 1, 2, and 3, are versions of the various contracts between AHF and the Department. Exhibits 4, 5, 6, 7, 9 and 10 are various communications.  Exhibit 4 is a letter from the Department to AHF dated June 30, 2022.  Exhibit 5 is a letter from Senator Kamlager to the Department dated August 29, 2022.  Exhibit 6 is a letter from the Department Director Michelle Baass to Senator Kamlager dated September 8, 2022.  Exhibit 7 is a letter from the PHC Special Needs Plan to PHC Enrollees dated November 21, 2021.

Exhibit 9 is an email from Administrative Law Judge, Hon. Vincent Blackburn dated October 28, 2022, vacating the formal hearing for AHF's appeal.  Exhibit 10 is an email DHCS sent to AHF pertaining to the PHC Special Needs Plan and the prevention of new enrolled for December 2022, dated November 1, 2022.

Exhibit 8 is an article published on the Center for Disease Control and Prevention website entitled "Understanding the HIV Care Continuum" and accessed at https://www.cdc.gov/hiv/pdf/library/factsheets/cdc-hiv-care-continuum.pdf.

The Department does not object to AHF's requests for judicial notice.  Also, while none of these exhibits present facts that are "generally known within the trial court's jurisdiction" they are documents that do not appear to be subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned[.]" *See* FED. R. EVID. 201; *see also Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 933 n. 6 (C.D. Cal. 2019) (taking judicial notice of off-the-record statements made on Twitter).  One communication even arises from the administrative proceeding.  *See 14.02 Acres of Land More or Less in Fresno Cnty*, 547 F.3d at 955.  Additionally, a government agency document available from a reliable source on the internet is proper matter for judicial notice.  *See Cross Culture Christian Ctr. v. Newsome*, 445 F. Supp. 3d 758, 764 (E.D. Cal. 2020).

The Court therefore **GRANTS** AHF's request for judicial notice.

1

**B.     The Department's Request for Judicial Notice**

2

The Department requests this Court take judicial notice of the following filings

3

- Administrative Appeal, dated September 1, 2022

4

- Notice of Time and Place of Formal Hearing, dated September 8, 2022

5

- Additional Notice of Dispute, dated September 23, 2022

6

- Petition for Writ of Mandate filed in Sacramento County Superior Court Case No. 34-2022-

7

80004011, dated September 16, 2022.

8

Def.'s RFJN, Exs. A–D.  AHF has not opposed these requests.  Each of these documents are matters

9

of public record, which includes records from administrative proceedings.  *14.02 Acres of Land*

10

*More or Less in Fresno Cnty*, 547 F.3d at 955.

11

The Court therefore **GRANTS** the Department's request for judicial notice.

12

**C.     AHF's Objections to the Department's Evidence**

13

Concurrently filed with its Reply, AHF submitted evidentiary objections to the Rafael

14

Davtian and Michelle Retke declarations submitted in support of the Department's Opposition.  AHF

15

raises several objections under the Federal Rules of Evidence. *See* ECF Nos. 21-1, 21-2 ("Plaintiff's

16

Evidentiary Objections").  AHF challenges statements made objecting on the grounds of relevancy,

17

improper conclusion, inadmissible hearsay, improper lay opinion, lack of personal knowledge.  *See*

18

FED. R. EVID. 401, 602, 701, 801.  When assessing whether to grant a preliminary injunction, the

19

Court "may give even inadmissible evidence some weight, when to do so serves the purpose of

20

preventing irreparable harm before trial." *Flynt Distrib. Co.*, 734 F.2d at 1394.  Accordingly, to the

21

extent the Court relies on evidence that has been objected to, those objections are **OVERRULED**.

22

To the extent that the Court does not rely on evidence which AHF objected to, the Court

23

**OVERRULES** those objections as **moot**.

24

**MOTION FOR PRELIMINARY INJUNCTION**

25

**I.     Applicable Law**

26

Rule 65 of the Federal Rules of Civil Procedure provides that "[t]he court may issue a

27

preliminary injunction only on notice to the adverse party." FED. R. CIV. P. 65(a)(1).  "A

28

preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res.*

12

*Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Id.* at 20 ("*Winter* Test").  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The Ninth Circuit also recognizes a "serious questions" variation of the *Winter* Test.  *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).  Under this variation, "a preliminary injunction is proper if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of the hardships tips sharply in favor of plaintiff; and injunction is in the public interest."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

As the party seeking preliminary relief, AHF "carries the burden of proof on each element of the test."  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  "A preliminary injunction is an extraordinary and drastic remedy" and "should not be granted unless the movant, *by clear showing*, carries the burden of persuasion."  *Lopez*, 680 F.3d at 1072 (emphasis in original) (quotations omitted).

Before turning to the *Winter* test, the Court will briefly address the issues of standing and exhaustion.

### A.   Standing

The Department did not challenge AHF's standing.  Nevertheless, standing is a threshold matter of jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).  To have standing, AHF must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "At the preliminary injunction stage, the plaintiff[] must make a clear showing of each element of standing, . . . relying on the allegations in their complaint 'and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden."  *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956–60 (9th Cir. 2021) (internal citations and quotations omitted).  AHF "must demonstrate

1  standing separately for each form of relief sought," and the "remedy must be tailored to redress

2  [their] particular injury[.]"  *Id.* (internal quotations and citations omitted).

3       AHF has established standing to assert the claims asserted on its own behalf.  AHF has

4  alleged six causes of action—three of which are grounded in the First Amendment and three of

5  which are grounded in Article I of the California Constitution.  The essence of AHF's claims as it

6  relates to its own speech, is that the Department's decision not to extend the Contract violated its

7  right to free speech and petition.  AHF has also presented evidence showing that its injury is "not

8  conjectural or hypothetical," *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010), because the

9  Department's Director expressed that the reason for not extending the Contract, among other things,

10  was AHF's act of speaking.  Pl's. RFJN Ex. 6.  This evidence also shows that AHF's injury is

11  directly traceable to the Department's decision not to extend the Contract.  Finally, AHF's injury

12  may be redressed by enjoining the Department from relying on AHF's protected speech in

13  determining not to extend AHF the benefit of contracting as a MCP.  Thus, AHF has standing to

14  assert its claims on its own behalf. [5]

15       **B.     Exhaustion**

16       The Department argues that the Contract requires AHF exhaust its administrative remedies

17  which encompass the constitutional claims asserted in this action.  Opp'n at 8–9.  AHF alleges in its

18  Complaint that the administrative proceeding currently underway "are unrelated to, and do not

19  involve, alleged Constitutional violations by" the Department and that the "Contract's dispute

20  resolution provisions do not cover alleged governmental Constitutional violations."  Compl. ¶ 5 n. 1.

21  The Court agrees with AHF.

22       The relevant portion of the Contract the Department relies upon provides that the "Disputes

23  section will be used by the Contract as the means for seeking resolution of disputes *on contractual*

24  *issues*."  Retke Decl., ¶ 7, Ex. 9, Sixth Amendment to Primary Contract, Ex. E, Att. 2, Prov. 19

25  (emphasis added).  There are certainly disputes between the parties related to the Contract.  The

26

27  [5] While the Court has concerns whether AHF is seeking relief on behalf of enrollees, and that AHF has not
    sufficiently established standing to assert claims on behalf its enrollees, the Court need not address this issue.
28  As AHF confirmed at the hearing, AHF is proceeding as the sole plaintiff.

1    Contract required the Department to approve of certain notices that AHF sent to enrollees.  Retke

2    Decl., ¶ 6, Ex. 1, Primary Contract Ex. A, Att. 13, Prov. 5.  AHF did not obtain pre-approval before

3    sending the Nov. 2021 Letter to enrollees.  And the Department relies on the Contract's terms and

4    AHF's alleged breached of those terms, to justify its decision to not extend the Contract term.

5         However, the underlying inquiry in this action is whether the Department's conduct violated

6    AHF's constitutional rights.  Even assuming AHF did breach the Contract (which the Court does not

7    address), questions would remain: was AHF's Nov. 2021 Letter constitutionally protected speech? If

8    so, does the Department's interests in enforcing the Contract terms outweigh AHF's protected

9    speech interest.  *See Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668,

10   685 (1996).  These inquiries are constitutional and not contractual; in fact the Department's

11   Contracting Officer appears to have determined as much. *See* Pl.'s Notice and Update of

12   Developments in Plaintiff's State Court Action and Underlying Administrative Proceeding, Ex. 1 at

13   2.  The Court therefore finds that the Contract does not require exhaustion of AHF's claims.

14        The Department alternatively argues that even if the Contract does not cover the

15   constitutional claims, the Court should nevertheless require AHF to exhaust its administrative

16   remedies "as a prudential matter."  Opp'n at 11–13.  The Department relies on the "judicial created

17   doctrine of exhaustion[.]"  *Id.* (citing *United States v. California Care Corp.*, 709 F.2d 1241, 1248

18   (9th Cir. 1983)).  Courts under this doctrine

19

20        may still require exhaustion if: (1) agency expertise makes agency consideration
          necessary to generate a proper record and reach a proper decision; (2) relaxation of
21        the requirement would encourage the deliberate bypass of the administrative
          scheme; and (3) administrative review is likely to allow the agency to correct its
22        own mistakes and to preclude the need for judicial review.

23

24   *California Care Corp.*, 709 F.2d at 1248 (applying factors to a health care dispute).  These factors do

25   not weigh in favor of requiring exhaustion here.

26        First, the agency's expertise in the "unique customs and practices of Medi-Cal managed care

27   plans, and the experience of the OAHA possesses in dealing with Medi-Cal health plan disputes[,]"

28

1    Opp'n at 12, would have little relevance in determining whether the Department violated AHF's

2    constitutional speech rights.

3          Second, relaxation of the requirement would not encourage deliberate bypass of the

4    administrative scheme because the issues presented are specific to AHF—whether AHF's Nov. 2021

5    Letter was protected speech and whether the Department's reliance on this letter in deciding not to

6    extend the Contract, violated AHF's constitutional rights.  Additionally, in *California Care Corp.*,

7    the providers seeking relief in the district court had for three years "abused" the agency's appeal

8    procedures to "avoid or delay any proper repayment of their Medicare advances."  *Id.* at 1248.

9    There is no evidence of similar abuse here.  The Department informed AHF of its decision not to

10   extend the Contract in June of 2022.  AHF filed its initial claim with the Department on July 8, 2022,

11   challenging the Department's decision, and that claim was denied.  Declaration of Michelle Retke ¶

12   23, Exs. 6, 7.  AHF appealed, and its administrative appeal, while currently pending, has no formal

13   hearing date scheduled as of November 1, 2022.  Def.'s RFJN Ex. B (setting a November 30 hearing

14   date); Pl.'s Supp. RFJN, Ex. 9 (vacating the November 30 hearing date because of the need to

15   resolve a discovery dispute).  AHF has also filed a Writ of Mandate with the California Superior

16   Court, seeking a similar injunction but for reasons relevant to the contractual dispute between the

17   parties.  Def.'s RFJN Ex. D.

18         The third factor does tend to weigh in favor of requiring exhaustion.  The result of the

19   administrative proceedings could "allow the agency to correct its own mistakes" which would avoid

20   the need for this Court to address the Constitutional issues raised in the instant suit.  *Montana*

21   *Chapter of Ass'n of Civilian Technicians, Inc. v. Young*, 514 F.2d 1165, 1167–68 (9th Cir. 1975)

22   ("The necessity of deciding the constitutional issues may well be avoided by the grant of alternative

23   administrative relief.").  However, the relief sought in the instant motion is preliminary relief

24   pending the results of the trial on the merits.  In *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush*

25   *and Co., Inc.*, 240 F.3d 832 (9th Cir. 2001), the Ninth Circuit held exhaustion was not required and

26   affirmed the district court's decision to grant preliminary injunction for movant, Sisco.  *Id.* at 837–

27   39.  The case involved a trademark dispute, but goods were seized by United States Customs

28   Service.  *Id.* at 836.  The party opposing the preliminary injunction argued that Sisco had to exhaust

1    the Custom's Services' detention and administrative process before it could bring suit in the district

2    court. *Id.* at 837.  The court disagreed, reasoning that requiring administrative exhaustion in this

3    context would be futile for two reasons. *Id.* at 838.  First, "validity of a trademark cannot be

4    challenged in a forfeiture proceeding because the CIT does not have jurisdiction over substantive

5    trademark issues[.]" *Id.*  Second, "the administrative process would have left Sisco without any

6    remedy during the detention period" considering Sisco faced a pending delivery deadline and

7    "needed to obtain the immediate release of its goods to avoid irreparable harm stemming from lost

8    contracts and customers, and harm to its business reputation and good will." *Id.*  Similarly, here,

9    while the agency's resolution of whether the parties' contractual disputes may inform the

10   constitutional analysis, if the resolution is not in AHF's favor, it does not resolve AHF's

11   constitutional claims.  And the Contract is set to expire December 31, 2022, leaving AHF without

12   the remedy it is seeking during the pendency of its administrative appeal which, based on the record

13   provided, does not look like it will be resolved before that date.  As will be discussed below, the end

14   of the PHC Special Needs Plan may result in irreparable injuries to AHF by frustrating and

15   materially interfering with its organizational mission and chilling its exercise of constitutional rights.

16   *See* Declaration of Michael Weinstein, ¶ 3.

17           Therefore, due to the urgency involving AHF's request for preliminary relief, the Court

18   declines to exercise its discretion in requiring exhaustion.

19           The Court now turns to the *Winter* test governing preliminary injunctive relief.  *See Winter*,

20   555 U.S. at 20.

21

22

23

24

25

26           / / /

27           / / /

28           / / /

1      **C.      *Winter* Test**

2             1.      <u>Likelihood of Success on the Merits</u>[6]

3                    a.      AHF's First Amendment Claims

4             "The First Amendment shields public employees from employment retaliation for their

5      protected speech activities." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012)

6      (internal quotations and citations omitted).  Because "independent government contractors are

7      similar in most relevant respects to government employees" the United States Supreme Court

8      extended similar First Amendment protections afforded to government employees to government

9      contractors.  *See Board of Cty. Com'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 684–85

10     (1996); *see also Riley's American Heritage Farms v. Elsasser*, 32 F.4th 707, 722 (2022) (treating

11     school district's long standing relationship with plaintiffs to provide educational services to students

12     analogous to relationship between government and government contractor for First Amendment

13     retaliation claim); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004)

14     (recognizing "[w]hen a business vendor operates under a contract with a public agency, [the Court]

15     analyzes its First Amendment retaliation claim . . . using the same basic approach that [the Court]

16     would use if the claim had been raised by an employee of the agency.").  To state a claim for First

17     Amendment retaliation, a contractor must establish "(1) it engaged in expressive conduct that

18     addressed a matter of public concern; (2) the government officials took an adverse action against it;

19     and (3) its expressive conduct was a substantial or motivating factor for the adverse action." *Alpha*

20     *Energy Savers, Inc.*, 381 F.3d at 923 (citation omitted).  "This final element of the prima facie case

21     requires plaintiff to show causation and the defendant's intent. . . Where, as here, a plaintiff alleges

22     First Amendment retaliation, the plaintiff must show that the government defendant 'acted with a

23     retaliatory motive.'" *Elsasser*, 32 F.4th at 721 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722

24     (2019)).  If the contractor meets this burden, the state actor "can nonetheless escape liability if [it]

25

26     _____

27     [6] After the hearing, and while this Court was preparing to issue its ruling, Defendants filed a motion to
       dismiss raising the issue of immunity under the Eleventh Amendment for the first time.  Given that this issue
       was raised so late, there is not enough time for AHF to respond and the Court to hear the motion prior to
28     December 31.  Accordingly, the Court will not consider this issue in its likelihood of success analysis.

1   demonstrate[s] either that: (a) under the balancing test established by *Pickering v. Board of*

2   *Education*, [391 U.S. 563 (1968)], legitimate administrative interests in promoting efficient service-

3   delivery and avoiding workplace disruption outweigh the contractor's free speech interests;" or "(b)

4   under a mixed motives analysis established by *Mt. Healthy City School District Board of Education*

5   *v. Doyle*, [429 U.S. 274, 287 (1977)], they would have taken the same actions in the absence of the

6   contractor's expressive conduct." *Id.* (citing to *Umbehr*, 518 U.S. at 675–76).

7         The Department argues that AHF has failed to show a likelihood to succeed on the merits

8   because (1) AHF's speech—the Nov. 2021 Letter—was not on a matter of public concern; (2) the

9   Nov. 2021 Letter was sent in AHF's official, not private, capacity; and (3) the Department's decision

10  to not extend the Contract was permissible and justified due to AHF's breaches and refusal to cure

11  those breaches.  *See* Opp'n at 15–18.[7]

12                              i.      *Did AHF Speak on a Matter of Public Concern?*

13        Plaintiff has the burden of showing that the speech addresses an issue of public concern.  *See*

14  *Eng v. Cooley*, 552 F.3d 1062,  1070–71 (9th Cir. 2009).  "[S]peech involves a matter of public

15  concern when it fairly can be said to relate to 'any matter of political, social, or other concern to the

16  community.'"  *Gibson v. Off. of Atty. Gen., State of California*, 561 F.3d 920, 925 (9th Cir. 2009)

17   (quoting *Connick v. Myers*, 461 U.S. 138, at 146 (1983)).  Whether the contractor's speech

18  addresses a matter of public concern looks at the "content, form, and context of a given statement, as

19  revealed by the record as a whole."  *Connick*, 461 U.S. at 147–48.  "Speech that concerns issues

20  about which information is needed or appropriate to enable the members of society to make

21  informed decisions about the operation of their government merits the highest degree of first

22  amendment protection."  *Alpha Energy Savers, Inc.*, 381 F.3d at 924 (internal quotations and citation

23  omitted). "In contrast, speech that deals with individual personnel disputes and grievances and that

---

[7] The parties do not appear to dispute that deciding not to extend the Contract constitutes "adverse action" taken against AHF.  *See Alpha Energy Savers, Inc.*, 381 F.3d at 923.  Also, because it would be the Department's burden to show and because the Department does not argue it, the Court also does not address whether the Department would have taken the same action in the absence of AHF's expressive conduct.  *See Doyle*, 429 U.S. at 287.

1   would be of no relevance to the public's evaluation of the performance of government agencies, is

2   generally not public concern." *Id.* (internal quotations omitted).

3   The Department argues that AHF's Nov. 2021 Letter did not address a matter of public

4   concern because AHF sent the letter in the context of contract negotiations concerning its demand

5   for higher reimbursement rates.  The Department characterizes the context of the letter as revealing

6   the "inherently private nature of the dispute addressed by AHF's speech." *Id.*  AHF counters that

7   "[e]verything about the existence and success of the PHC Special Needs Plan are critical issues of

8   public concern."  Reply at 8.  The Court agrees more with AHF.

9   In *Connick*, the Supreme Court addressed whether an internal questionnaire shared with

10   coworkers in a district attorney's office addressed a matter of public concern.  461 U.S. at 148–49.

11   The Court did not consider plaintiff's "questions pertaining to the confidence and trust that [her]

12   coworkers possess in various supervisors, the level of office morale, and the need for a grievance

13   committee" raised matters of public concern.  *Id.* 148–49.  However, asking whether assistant district

14   attorney's "ever feel pressured to work in political campaigns on behalf of office supported

15   candidates" did touch on a matter of public concern.  *Id.*  Here, while the Nov. 2021 Letter addressed

16   a dispute between two contracting parties that may be characterized a private grievance, the letter

17   also touched on a matter of public concern—the continuing of a healthcare plan tailored to Medi-Cal

18   beneficiaries diagnosed with AIDS.  The letter also addressed the State of California's budget and

19   projected surpluses for 2022, which caused AHF to believe it to be "unthinkable" that the

20   Department would not be able to increase the rates AHF demanded.  Pl.'s RFJN Ex. 7.  In addition,

21   AHF noted its belief that this decision "will add to California's long-term healthcare costs, because

22   studies have shown time and again that those who have less access to healthcare now tend to get

23   sicker and need more expensive care later." *Id.*  AHF thereafter provided contract information for

24   enrollees to "let the DCHS" know how they feel.  *Id.*

25   Thus, the Court finds that the Nov. 2021 Letter involved a matter of public concern.  *See*

26   *Pickering*, 391 U.S. at 565 (teacher commented on matters of public concern when he sent a letter to

27   local paper attacking School Board's handing of fiscal issues and allocation of financial resources);

28   *Johnson v. Multanomah Cnty, Or.*, 48 F.3d 420, 425 (9th Cir. 1995) (noting while employee's

1    speech may have arisen from not having been promoted it "concerned information that is of inherent

2    relevance to the public's evaluation of the performance of government agencies." (internal

3    quotations omitted)).  The fact that the Nov. 2021 Letter was sent to only those enrolled in the PHC

4    Special Needs Plan and not to the general public, is not dispositive in determining whether the

5    speech addressed a matter of public concern.  *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1068 n. 5

6    (9th Cir. 2013).  AHF speaks to the state's budget surpluses received and projected for 2022, as well

7    as possible increases to long term healthcare costs for California, information that is more akin to

8    "issues about which information is needed or appropriate to enable the members of society to make

9    informed decisions about the operation of their government."  *See Alpha Energy Savers, Inc.*, 381

10   F.3d at 924 (internal quotations and citation omitted).  Moreover, the decision to allow the Contract

11   to expire prompted inquiry from the Los Angeles County Delegation and Senator Kamlanger.  Pl.'s

12   RFJN Ex. 5.  This evidence further supports the finding that the Nov. 2021 Letter addressed matters

13   of public concern.

14          Having found that the Nov. 2021 Letter discussed a matter of public concern, the Court will

15   now turn to the Department's argument that AHF's letter was sent in its official capacity as a

16   contractor with the Department.

17                    *ii.      Did AHF Speak in its Official Capacity as a Contractor?*

18          AHF has the burden of showing that the speech was spoken in the capacity as a "private

19   citizen" and not in an official capacity.  *See Eng*, 552 F.3d at 1070–71.  When determining whether

20   the speech is undertaken pursuant to the speaker's official duties or as a private citizen, courts

21   consider the party's official responsibilities.  *See Posey v. Lake Pend Oreille Sch. Dist., No. 84*, 546

22   F.3d 1121, 1127 (9th Cir. 2008).  "[S]tatements are made in the speaker's capacity as citizen if the

23   speaker had no official duty to make the questioned statements, or if the speech was not the product

24   of performing the tasks the employee was paid to perform."  *Posey*, 546 F.3d at 1127 n. 2

25   (alterations, citation and internal quotation marks omitted).  The Ninth Circuit looks to "three non-

26   exhaustive factors to make this assessment: (1) whether 'the employee confined his communications

27   to his chain of command'; (2) whether 'the subject matter of the communication' fell within the

28   plaintiff's regular job duties; and (3) whether the 'employee sp[oke] in direct contravention to his

1  supervisor's order[ ].'"  *Greisen v. Hanken*, 925 F.3d 1097, 1111 (9th Cir. 2019) (quoting *Dahlia v.*

2  *Rodriguez*, 735 F.3d 1060, 1074–75 (9th Cir. 2013) (en banc)) ("*Dahlia* Factors").  "The scope and

3  content of a plaintiff's official duties are questions of fact, but a court must 'independently . . .

4  evaluate the ultimate constitutional significance of the facts as found.'"  *Id.* (quoting *Posey*, 546 F.3d

5  at 1129).

6         The idea that speech in one's official capacity is unprotected arises from the Supreme Court's

7  decision in *Garcetti v. Ceballos,* 547 U.S. 410, 424 (2006) ("the First Amendment does not prohibit

8  managerial discipline based on an employee's expressions made pursuant to official

9  responsibilities.")  There the Supreme Court held that a deputy district attorney was speaking in his

10  official capacity when he wrote a memorandum to his supervisors recommending dismissal of a case

11  and addressing what he believed to be an improper warrant.  *Garcetti*, 547 U.S. at 414, 421.

12  However, in that case the parties did not dispute that the plaintiff wrote the memorandum giving rise

13  to the claim pursuant to his employment duties.  *Id.* at 424.  Therefore, the Supreme Court declined

14  to "articulate a comprehensive framework for defining the scope of an employee's duties in cases

15  where there is room for serious debate."  *Id.*  Importantly, the Supreme Court determined that it was

16  "nondispositive" that the memorandum concerned the subject matter of the deputy district attorney's

17  employment, as "[t]he First Amendment protects some expressions related to the speaker's job."  *Id.*

18  at 421.

19         The Court has not found a case that extended *Garcetti* to the instance where an entity-

20  contractor has alleged First Amendment retaliation claims for the entity's speech.  However, courts

21  have analyzed *Garcetti*'s applicability to instances involving individual contractors alleging First

22  Amendment retaliation claims.  *See e.g.*, *Clairmont v. Sound Mental Health,* 632 F.3d 1102, 1105–

23  06 (9th Cir. 2011) (treating domestic abuse counselor who worked for a private treatment provider

24  which was under contract with municipal court as analogous to an employer and employee for

25  purposes of First Amendment retaliation claim); *Jacobson v. Schwarzenegger*, 650 F.Supp.2d 1032,

26  1057–58 (C.D. Cal. 2009) (applying *Garcetti* to dispute between California Board of Prison Terms

27  and contracted parole revocation attorney).

28

The Court will apply the principles outlined above, including the *Dahlia* factors, to the circumstances presented in this case in analyzing whether AHF was speaking outside of its official capacity as contractor to the Department when it sent the Nov. 2021 Letter to enrollees.

As to the first *Dahlia* Factor—whether the employee confined his communications to his chain of command—the Court finds this factor to be neutral as applied to the facts here.  The Nov. 2021 Letter was issued to PHC California enrollees, individuals that likely expected or had likely received in the past notices from AHF.  AHF did not send the letter to the general public, nor did it send the letter to anyone at the Department conceivably "up the chain of command" which AHF might be expected to address contract or fiscal complaints.  *See Dahlia*, 735 F.3d at 1076 (concluding "the only reasonable conclusion" was that officer acted pursuant to his job duties when he—as a detective investigating the . . . robbery[]—reported up the chain of command to the supervising lieutenant overseeing the investigation about abuse related to that same investigation."); *Freitag*, 468 F.3d 528, 546 (9th Cir. 2006) (noting plaintiff's "internal reports of inmate sexual misconduct and documentation of the prison's failure to respond" was *not* constitutionally protected because she "submitted those reports pursuant to her official duties as a correctional officer and thus not in her capacity as a citizen.").

The parties primarily dispute the second factor under *Dahlia*—whether the subject matter of the communication fell within the plaintiff's regular job duties.  The Department argues that AHF sent the notice in its capacity as a government contractor because: the letter was sent on with "PHC California" letterhead from AHF's "MEMBER SERVICES" unit; the letter was a "targeted communication" sent only to members with the PHC Special Needs Medi-Cal plan; and under the Contract AHF was obligated to send written notification to members notifying them of changes to covered services.  Opp'n at 17.[8]

---

[8] For example, Contract provides:

> **5.      Notification    of    Changes    in    Access    to    Covered    Services**
> **A.**      Contractor shall ensure Medi-Cal Members are notified in writing of any changes in the availability or location of Covered Services, or any other changes in information listed in 42 CFR 438.10(f)(4)**(g)**, at least 30 calendar days prior to the effective date of such

In response AHF asserts that it spoke on matters "outside the contract." *See* Reply at 5–8. AHF asserts that by informing members about what "might" occur in the future, is not required under the contract. *Id.* at 5. AHF maintains that the letter informed members about the "interactions and negotiations between the parties concerning the PHC Special Needs Plan and how PHC enrollees might get involved should they wish to advocate for themselves through petition." *Id.*

This factor weighs in favor of finding AHF spoke outside of its official capacity as a contractor. The Nov. 2021 Letter discusses AHF's financial dispute with the Department while also providing pertinent information related to the PHC Special Needs Plan to its members. AHF contracts with the Department to provide these specific enrollees benefits under its PHC Special Needs Plan. Declaration of Donna Stidham ¶ 7. Under the Contract, AHF is to obtain the Department's approval before sending "member information" to members and "Member information" includes "significant mailings and notices, and any notices related to Grievances, actions, and Appeals." Declaration of Michelle Retke, Ex. 9, Sixth Amendment to Primary Contract, Ex. A, Att.13, Provs. 4(D); Pl.'s RFJN, Ex. 3 (referred to as Contract 11-88286 A 10, §XVII, Exh. A, Attach. 13). The Contract also requires that the Contractor "ensure Medi-Cal Members are notified in writing of any changes in the availability or location of Covered Services, or any other changes in information listed in 42 CFR 438.10(g) [.]" Declaration of Michelle Retke, Ex. 9, Sixth Amendment to Primary Contract, Ex. A, Att.13, Provs. 5(A); Pl.'s RFJN, Ex. 3 (referred to as Contract 11-88286, Exh. A, Attach. 13).

While AHF maintains that it was not governed by these provisions when it sent the letter to enrollees, the Contract's terms tend to support that at least some of the letter's contents was AHF speaking its official capacity as the operator of the PHC Special Needs Plan. AHF begins the Nov. 2021 Letter by reminding members that it is AHF "is always here to serve [their] healthcare needs

---

changes. In the event of an emergency or other unforeseeable circumstances, Contractor shall provide notice of the emergency or other unforeseeable circumstance to DHCS as soon as possible. The notification must also be presented to and approved in writing by DHCS prior to its' release.

Retke Decl., Ex. 9, Sixth Amendment to Primary Contract, Ex. A., Att, 13, Provs. 5(A).

1   under all circumstances" and that AHF is "writing to tell [them] that PHC California, the Medi-Cal

2   health plan which is operated by AHF, **may** sunset[.]"  Pl.'s RFJN Ex. 7.  It goes on to inform

3   members what to expect after December 31, 2021, provide advice to members about what they

4   should do in the meantime, and inform members of what options they would have if the PHC plan

5   ended on December 31, 2021.  But while this content can be said to relate to AHF's position in

6   operating the PHC Special Needs Plan through its Contract with the Department, it did not inform

7   enrollees about what will occur, but only what "**may**" occur and how enrollees can petition to avoid

8   this result.

9       Moreover, the latter part of the letter addresses different concerns that tend to fall further

10  outside of AHF's role as a contractor and more as a private actor informing others of matters of

11  public concern.  AHF discloses that the Department has not been able to provide AHF with rates

12  sufficient to cover enrollees' healthcare costs.  AHF then points out that the State "has experienced

13  several years of continuous budget surpluses, with another surplus projected for 2022" and that AHF

14  believes it is "unthinkable that in spite of these surpluses" the Department cannot meet AHF's

15  financial needs to continue the PHC Special Needs Plan.  Pl.'s RFJN Ex. 7.  AHF also expresses its

16  belief that this decision "will add to California's long-term healthcare costs, because studies have

17  shown time and again that those who have less access to healthcare now tend to get sicker and need

18  more expensive care later." *Id.* AHF ends its letter by implicitly encouraging members to contact the

19  Department if they wished to let the Department know how they felt "about its decision not to

20  adequately fund" plan. *Id.*

21

22      The proper inquiry is a practical one. Formal job descriptions often bear little
        resemblance to the duties an employee actually is expected to perform, and the
23      listing of a given task in an employee's written job description is neither necessary
        or sufficient to demonstrate that conducting the task is within the scope of the
24      employee's professional duties for First Amendment purposes.

25

26  *Garcetti*, 547 U.S. at 424–25.  Applying these principles here, whether the Contract required AHF to

27  send notices to members addressing even potential changes to their PHC Special Needs Plan, is also

28  "neither necessary or sufficient to demonstrate that" sending the Nov. 2021 Letter with within the

25

scope of AHF's professional duties for First Amendment purposes.  Applying a practical inquiry to the facts in the record show that informing enrollees that the PHC Special Needs Plan may soon expire because of a financial dispute and critiquing the Department's use of funds in light of the State's budget surpluses, as well as projecting the impact on California's long term healthcare costs does not appear to be within AHF's role or responsibilities as a contractor for the Department.  Nor does it appear that AHF spoke as a contractor for the Department when it provided contact information to enrollees implicitly encouraging them to contact the Department directly and let it know how they feel about the expiration of the plan.

Accordingly, the letter's content aligns closer to cases which have found the disclosure of misconduct or complaints to be speech conducted in a private capacity.  *See e.g., Greisen*, 925 F.3d at 1111–12 (concerns related to "ferreting out 'corruption or systemic abuse' in city finances and management" were not part of plaintiff's official duties as chief of police); *Freitag*, 468 F.3d at 546 (holding it was "certainly not part of [plaintiff's] official tasks to complain" to a senator or the California Inspector General about the states failure to take corrective action regarding complaints of sexual harassment); *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007) (plaintiff's complaints regarding his superiors' allegedly corrupt overpayment schemes were not part of his official job duties as a Chief Engineer for a ferry); *Clairmont*, 632 F.3d at 1104 ("speech discussing threats to public safety is of vital interest to citizens and speech exposing policies that put people in jeopardy is inherently of interest to the public." (internal quotations and citations omitted)).  AHF is discussing the state's budget surplus, how that budget is being used, and AHF's views on how to limit California's long-term healthcare costs; these are all quintessentially matters of public concern.[9]

Turning to the final *Dahlia* factor—whether the employee spoke in direct contravention to his supervisor's order—this factor weighs in favor of finding that AHF spoke outside of its official capacity.  According to the Department, AHF's act of sending the Nov 2021 Letter without their approval was in direct contravention to the Contract's requirements.  Although AHF disputes that its

---

[9] Again, while the letter targeted a limited group of only those enrolled in the PHC Special Needs Plan, this fact is not dispositive in determining whether the speech addressed a matter of public concern. *See Dhalia*, 735 F.3d at 1068 n. 5

conduct breached the Contract or was otherwise governed by the Contract, this factor tends to support that AHF acted outside its official capacity as contractor when it chose to distribute the Nov. 2021 Letter to enrollees without the Department's notice or approval, whether that breached the Contract or not.

Altogether, AHF has established a likelihood that it did not speak in its official capacity as a contractor when it informed enrollees of its financial dispute with the Department and discussed the projected surpluses the State was expected to receive.

> iii.   *Was AHF's expressive conduct a substantial or motivating factor for the adverse action?*

At the hearing, counsel for the Department stressed that the Court's focus should be limited to what the Department reasonably knew at the time the decision was made not to extend the Contract term.  To that end, the Department argues that it did not know the full contents of AHF's letter until the instant motion was filed.  *See* Declaration of Michelle Retke, ¶ 18.  Therefore, the Department asserts in essence, that it was not motivated to cancel the Contract because of AHF's *protected* speech.  AHF disputes that the Department did not know the contents of AHF's letter when it made its decision, and points to Director Baass's September 8, 2022 response to Senator Kamlager's questions.  Pl.'s RFJN Exs. 5–6.

What the government actor reasonably believed when it took adverse action is a relevant inquiry.  *See Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016) (employer's mistaken belief plaintiff engaged in political speech was relevant in determining whether plaintiff had established a First Amendment retaliation claim); *Waters v. Churchill*, 511 U.S. 661 (1994) (factual dispute regarding whether employer believed employee was speaking on matter of public concern was relevant in determining whether plaintiff had established a First Amendment retaliation claim).  This inquiry addresses whether AHF's expressive conduct was a substantial motivating factor in the Department's decision.  *See Elsasser*, 32 F.4th at 721 (when assessing the "final element of the prima facie case . . . plaintiff to show causation and the defendant's intent.")  "Put another way" AHF "must establish that [the Department] was motivated (or intended) to take the adverse action because of [AHF's] expressive conduct."  *Id.*

In *Waters*, the Supreme Court in a plurality decision held that "as long as the employer (1) had reasonably believed the employee's conversation had involved personal matters, not matters of public concern, and (2) had dismissed the employee because of that mistaken belief, the dismissal did not violate the First Amendment." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272 (2016) (stating the holding of *Waters*, 511 U.S. at 679–80). There Plaintiff, a nurse, was fired after others relayed a conversation plaintiff had with co-workers while on a break. *Waters*, 511 U.S. at 664. The parties disputed what the Plaintiff specifically said, but the Supreme Court noted that the speech "as reported" to the employer by trusted employees was unprotected. *Id.* at 679. And even if there were speech that touched a matter of public concern, "the potential disruptiveness of the speech as reported was enough to outweigh" Plaintiff's First Amendment rights. *Id.*

More recently, in *Heffernan*, the Supreme Court held

> the government's reason for demoting Heffernan is what counts here. When an employer demotes an employee out of desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment . . . even if, as here, the employer makes a factual mistake about the employee's behavior.

578 U.S. at 273. In this case, during the reelection campaign for a city mayor, Heffernan, a police officer, picked up a campaign sign supporting the incumbent's opponent, at the request of his ailing mother. *Id.* at 269. Members of the police force saw Heffernan with this sign, and he was demoted from detective to patrol officer under the mistaken belief that he overtly involved in the incumbent opponent's campaign. *Id.* Heffernan filed a 42 U.S.C. section 1983 lawsuit alleging that he was demoted for reasons which violated of the First Amendment. *Id.* The District Court found Heffernan had not engaged in any First Amendment conduct and the Court of appeals affirmed. The Supreme Court granted Heffernan's petition for certiorari and concluded—assuming a policy prohibiting engagement in any political campaign was unconstitutional—that "an employer's belief that an employee has engaged in protected activity can cause the same kind, and degree, of constitutional harm whether that belief does or does not rest upon a factual mistake." *Id.* at 274.

1    The Court reversed for the lower court to determine if the policy of preventing officers from overt
2    involvement in any political campaign was constitutional in the first instance. *Id.* at 274–75.

3           Relying on *Waters* and *Heffernan*, at the hearing the Department asserted that because it was
4    informed by a lobbyist that AHF sent unapproved notices to enrollees that their plans would soon
5    expire, and this conduct seemingly breached the parties' Contract, it was later decided to allow the
6    Contract to expire. *See also* Declaration of Michelle Retke, Ex. 11.  AHF disputes that the Nov.
7    2021 Letter was governed by the terms of the Contract and argues the Department's knew that AHF
8    had engaged in protected speech because it acknowledged AHF's letter was intended, in part to
9    encourage enrollees to petition the Department directly.  Reply at 8–9.  It is AHF's burden on a
10   preliminary injunction to show a likelihood of success that the Department relied on the contents of
11   its Nov. 2021 Letter in deciding not to extend the Contract. To this end, the best evidence in the
12   record that demonstrates what the Department knew, or reasonably should have known, at the time it
13   decided to let not renew the Contract is Defendant Director Baass's response to Senator Kamlanger's
14   on September 8, 2022.  In response to the question "[u]nder what conditions or circumstances was
15   the contract terminated?" Defendant Baass responded that "AHF engaged in inappropriate
16   negotiation tactics, including sending unapproved notices to their members without obtaining pre-
17   approval of those notices from DHCS. *The presumed intention of those notices was to make AHF*
18   *members think that they would soon lose their care manager and services from AHF and cause*
19   *members to contact DHCS in protest*."  Pl.'s RFJN Exs. 5–6 (emphasis added).  This evidence tends
20   to show that the Department's Director at least knew that the letter informed enrollees that they may
21   lose certain benefits and urged enrollees to protest the Department's decision not to extend the
22   Contract.

23          Moreover, AHF sent the letter in November 2021 and the Contract was extended shortly
24   thereafter.  The Department did not inform AHF that it was not extending the Contract until seven
25   months later, in June 2022.  Thus, the facts of this case are distinguishable from *Heffernan* and
26   *Waters*, in that the adverse action (not extending the Contract) is imminent, while the harm of
27   chilling AHF's speech is ongoing.  Now undisputedly faced with the contents of the Nov. 2021
28   Letter, the Department is not changing course.  Indeed, the Department's counsel at the hearing

acknowledged that the Department is relying on the Nov. 2021 Letter, in part, in its decision not to extend the Contract. The other cited reasons are the subsequent breaches to the Contract when AHF did not send a copy of the Nov. 2021 Letter and did not draft a retraction to the letter, as requested. Both of which stem from AHF's expressive conduct in the first instance.

Accordingly, AHF has shown a likelihood of success in showing that its expressive conduct was a substantial motivating reason in the Department's decision to not extend the Contract.

*iv.*     *Balancing*

The Department can prevail "if it can persuade [the Court] that [its] legitimate interests as contractor, deferentially viewed, outweigh the free speech interest at stake." *Umbehr*, 518 U.S. at 685. "Independent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interest are typically—although not always—somewhat less strong in the independent contractor case." *Id.* at 694–85. "The government bears the burden of showing that under the *Pickering* balancing test, 'the relevant government entity had an adequate justification for treating the [contractor] different from any other member of the general public." *Clairmont*, 632 F.3d at 1106. The Department "must establish its 'legitimate administrative interests outweigh'" AHF's First Amendment rights. *Id.* (quoting *Eng*, 552 F.3d at 1071). Such interest may include "promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service." *Id.* at 1106–07 (citing to *Connick*, 461 U.S. at 150–51).

As a threshold matter, the Department argues that the Contract's terms limiting AHF's speech, and the later enforcement of those provisions, were constitutionally permissible because limiting AHF's speech was "*rationally related* to the substance of the contractual benefit conferred on AHF." *See* Opp'n at 18–20 (emphasis added). At the hearing counsel for the Department argued that this rational basis inquiry should be applied as part of the *Pickering*/*Umbehr* balancing test but could point to no authority to support this proposition. The Court declines the Department's invitation to insert a rational basis inquiry to the issue presented.

To start, the Supreme Court noted in *Umbehr*, that the "unconstitutional conditions precedents span a spectrum[.]" *Umbehr*, 518 U.S. at 680 (collecting cases). The Court took care to

acknowledge the different interests raised when the speaker has a relationship to the state actor closer to that of a member of the public. *Id.* at 677–78. "Independent contractors appear[ed]" to the Supreme Court "to lie somewhere between the case of government employees, who have the closest relationship with the government" and the Court's other precedent "which involve persons with less close relationships with the government." *Id.* The Court reasoned

> Umbehr is correct that if the Board had exercised sovereign power against him as a citizen in response to his political speech, it would be required to demonstrate that its action was narrowly tailored to serve a compelling government interest. But in this case, as in government employment cases, the Board exercised contractual power, and its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated. Deference is therefore due to the government's reasonable assessments of its interests as contractor.

> We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors.

*Id.* at 678.

Additionally, in cases analyzing both as-applied and facial challenges to a public employer's social media policy—which also limit or regulate speech—the Ninth Circuit has applied the *Pickering* balancing test. *See e.g.*, *Hernandez v. City of Phoenix*, 43 F.4th 966, 979 (9th Cir. 2022) (in analyzing facial challenge to employer social media policy limiting speech the court applied "a modified *Pickering* balancing analysis that closely tracks the test used for First Amendment retaliation claims."); *Moser v. Las Vegas Metropolitan Police Department*, 984 F.3d 900, 902 (9th Cir. 2021) (applying *Pickering* balancing test to plaintiff's claim for First Amendment retaliation after employer enforced of social media policy and took adverse action against employee for speech made on Facebook). While the Contract's limits on AHF's speech may be a fact to consider, the Department cannot avoid liability for First Amendment retaliation by merely arguing the Contract's terms are rationally related to the Department's interests.

1    Thus, the Supreme Court's framework set out under *Umbehr* and *Pickering* governs the facts

2   of this case. *See Umbehr*, 518 U.S. at 678, 685.[10]  The Court now turns to the merits of the

3   balancing test set out under *Pickering*, "adjusted to weigh the government's interests as a contractor

4   rather than as employer[.]" *Umbehr*, 518 U.S. at 673.

5    The administrative interest the Department identifies is "[t]he State's interest in enforcing

6   the[] [Contract] provisions as a means of ensuring adequate communication with Medi-Cal

7   beneficiaries consistent with legal and contractual requirements and Medi-Cal policy[.]" Opp'n at

8   21.  This formulation of the Department's interest is a bit circular.  The question before the Court, is

9   whether terminating the Contract because of AHF's speech is constitutional.  Put differently,

10   whether the Department's enforcement of the pre-approval requirement and speech limitations—is

11   constitutional.  So, to say that the Department has an interest in enforcing its Contract does not lend

12   itself the constitutional question.   The inquiry is: what interest is served through enforcement of the

13   Contract's terms?  To this end, it appears the Department's interest is "ensuring adequate

14   communication with Medi-Cal beneficiaries[.]"  Thus, to the extent that the Department is arguing

15   that AHF's speech disrupted its ability to ensure adequate communication with Medi-Cal

16   beneficiaries, the Department has not pointed to evidence in the record to support this argument.

17    "To prove that an employee's speech interfered with working relationships, the government

18   must demonstrate 'actual, material and substantial disruption, or reasonable predictions of disruption

19   to the workplace." *Clairmont*, 632 F.3d at 1107.  "Cases that analyze whether the government's

20   administrative interest outweighed the plaintiff's right to engage in protected speech examine

21   disruption resulting both from the act of speaking and from the content of the speech."  *Id.* at 1107.

22   Here, a declarant working for the Department claims that she and her department took significant

---

24   [10] The cases the Department relies upon are inapplicable. *See Dolan v. City of Tigard*, 512 U.S. 374, 385
25   (1994) (adopting a "rough proportionality" test when addressing whether the city "forced [plaintiff] to choose
     between the building permit or her right under the Fifth Amendment to just compensation"); *Bingham v.
26   Holder*, 637 F.3d 1040 (9th Cir. 2011) (plaintiff was required to sign a form giving up any right to challenge
     removal proceedings did not implicate unconstitutional conditions doctrine); *United States v. Geophysical
27   Corp. of Alaska*, 732 F.2d 693, 700 (9th Cir. 1984) (addressing whether "requiring permittees to agree to . . .
     uncompensated taking is an unconstitutional condition."); *Parks v. Watson*, 716 F.2d 646, 654 (9th Cir. 1983)
28   (addressing whether  it was improper to "condition the vacation of the street on the relinquishment of" the
     right to just compensation).

1    time in monitoring AHF, even before the letter was sent, and that AHF's act in sending the Nov.

2    2021 Letter "caused [the Department] great concern."  Declaration of Michelle Retke ¶¶ 9, 19.  The

3    Department's evidence provides more context in which AHF's sent the letter—during ongoing

4    negotiations—indicating "reasonable predications of disruptions" between the parties' contractual

5    relationship because the mere act in sending a communication to enrollees without the Department's

6    approval is alleged to have breached the parties' Contract.  However, the Department has not pointed

7    to evidence in the record showing how AHF's speech interfered with its ability to adequately

8    communicate with Medi-Cal beneficiaries.  The Court's finding on this point is influenced by the

9    fact that it appears that AHF's letter was neither false nor misleading.  It is certainly possible that as

10   this litigation progresses, the Department may be able to show that the communication was false or

11   misleading and that it caused some disruption to its legitimate interest in adequate communication

12   with beneficiaries.  But at this stage, the Department has not pointed to evidence in the record that

13   demonstrates its interest outweighs AHF's speech rights.

14          As the Ninth Circuit has recognized "the relative value of an employee's speech in advancing

15   First Amendment interests factors into the balancing calculus[.]"  *Hernandez*, 43 F.4th at 977; *see*

16   *also Connick*, 461 U.S. at 152 ("We caution that a stronger showing may be necessary if the

17   employee's speech more substantially involved matters of public concern.")  "Government employee

18   speech that exposes wrongdoing or corruption within the employee's own agency lies at 'the apex of

19   the First Amendment'[.]"  *Id.* at 979 (citations omitted); *see also Id.* (noting that police officer's

20   Facebook posts occupied "a much lower rung on the First Amendment hierarchy" only touching

21   matters of public concern in a limited sense.)  As indicated above, AHF's speech appears to occupy

22   a higher rung as it criticized the Department's handling of finances and outlined possible

23   consequences to enrollees and California's long term healthcare costs if the PHC Special Needs Plan

24   expired.  Balancing the parties' interest "adjusted to weigh the government's interests as a contractor

25   rather than as employer" the evidence in the record does not demonstrate the Department's interest

26   outweighs AHF's speech rights.

27          Altogether, AHF has shown a likelihood of prevailing on the merits.

28          / / /

b.   California Constitution

Article I, Section (2)(a) of the California Constitution provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right."  Cal. Const. art. I, § 2.  Article I, Section 3(a) provides that "[t]he people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."  Cal. Const. art. I, § 3

California law recognizes that the free speech rights afforded under the state constitution to be "more protective, definitive and inclusive of rights to expressions of speech than their federal counterparts."  *Lopez v. Tulare Joint Union High Sch. Dist.*, 34 Cal. App. 4th 1302, 1327 (1995), *as modified* (June 6, 1995).  "Generally, when [California courts] interpret a provision of the California Constitution that is similar to a provision of the federal Constitution, [courts] will not depart from the United States Supreme Court's construction of the similar federal provision unless we are given cogent reasons to do so."  *Kaye v. Bd. of Trustees of San Diego Cnty. Pub. L. Libr.*, 179 Cal. App. 4th 48, 57–58 (2009) (applying first amendment caselaw and holding plaintiff could not establish his discharge violated state's constitution.).  "California courts have routinely followed Supreme Court precedents in addressing public employee free speech matters."  *Id.*

Accordingly, the analysis addressed above would apply to AHF's claims under the California Constitution.  Therefore, the Court finds AHF has shown a likelihood of success in prevailing on the merits on its claims arising under the California Constitution as well.

2.   <u>Irreparable Harm</u>

"Irreparable harm is relatively easy to establish in a First Amendment case."  *CTIA- The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 851 (9th Cir. 2019).  "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim."  *Id.* (internal quotations and citations omitted).  Courts should focus "on irreparability, 'irrespective of the magnitude of the injury.'"  *East Bay Sanctuary Covenant v. Trump*, 354 F.Supp.3d 1094, 1116 (N.D. Cal. 2018) (quoting *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)).

The Department argues that because AHF's harm is monetary and quantifiable, it does not constitute irreparable harm.  Opp'n at 22–23.  AHF does identify that deprivation of organizational funding is one harm AHF faces if preliminary injunction is not granted.  Declaration of Michael Weinstein ¶ 22.  "Purely economic harms are generally not irreparable, as money lost may be recovered later, in the ordinary course of litigation." *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).  However, AHF argues that the doctrine of sovereign immunity precludes any monetary recovery from the Department for violation of the First Amendment.  Reply at 3 (citing Cal. Gov. Code § 815)); *see also Idaho*, 794 F.3d at 1046 (recognizing Tribal sovereign immunity "would likely bar State from recovery monetary damages incurred during course of" litigation.)  At the hearing the Department did not dispute this, but instead argued that should AHF prevail in its administrative proceeding addressing the Department's alleged breach of the Contract, it could receive monetary compensation.  This argument misses the mark.  The instant action addresses constitutional violations and the possibility that AHF could prevail in its administrative proceedings on the contractual issues is speculative.

AHF also points to additional non-monetary harms it claims will occur if a preliminary injunction is not granted.  For example, not extending the Contract, thereby ending the PHC Special Needs Plan, will "frustrate" and "materially interfere" with AHF's mission and goals to treat people living with AIDS without regard to their ability to pay and to save lives and reduce the transmission of HIV.  Declaration of Michael Weinstein ¶ 22 .  AHF also maintains that it "has been and will be irreparably harmed by the chilling" of its exercise of Constitutional rights.  *Id.*

AHF is a non-profit that started with "the mission to provide Los Angeles residents afflicted with AIDS a place and means to die with dignity." Declaration of Michael Weinstein, ¶ 3.  AHF'ss mission has progressed to also "provide cutting edge medical care to people living with HIV/AIDS regardless of their ability to pay with the goals of saving the lives of as many people living with HIV/AIDS as possible and ending the HIV/AIDS epidemic." *Id.* ¶ 4.  In "furtherance of this mission, AHF provides medical care" and services to "more than 1.6 million patients in 45 counties" across the world.  *Id.*  Thus, ending the PHC Special Needs Plan after over a decade of service, in retaliation against AHF's speech, would certainly frustrate and interfere in AHF's mission while

chilling its exercise of constitutional rights. *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (affirming "[b]ecause Plaintiffs have a colorable First Amendment Claim, they have demonstrated they will likely suffer irreparable harm if [challenged] Ordinance takes effect."); *see also Santa Cruz Lesbian and Gay Community Center v. Trump*, 508 F.Supp.3d 521, 545 (N.D. Cal. 2020) (recognizing "frustration of Plaintiffs' ability to carry out their core missions is itself irreparable harm."). This is particularly true in light of the apparent concession by the Department that the new MCP is unlikely to provide all of what AHF provides, including most notably the Registered Nurse care manager for all enrollees.

Finally, "[a] threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered." *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1023 (9th Cir. 2011) (internal quotations omitted).  Here, given that the Contract is set to expire on December 31, 2022, AHF has established a sufficient likelihood that, in the absence of preliminary injunctive relief, it will suffer irreparable harm before a trial on the merits could be held.

### 3.    Balance of Equities and Public Interest

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. "In assessing whether the plaintiffs have met this burden, the district court has a duty to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks and alteration omitted).  "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

To start, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks and citations omitted).  The Ninth Circuit has "'consistently recognized the significant public interest in upholding First Amendment principles.'" *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022) (quoting *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014)).  Where a

1  plaintiff has "raised serious First Amendment questions" it "compels the finding . . . that the balance

2  of hardships tips sharply in [Plaintiff's] favor."  *Am. Beverage Ass'n v. City & Cnty. of San*

3  *Francisco*, 916 F.3d 749, 758 (9th Cir. 2019).

4      The public also has an interest in ensuring members of the community diagnosed with AIDS

5  obtain uninterrupted care which in turn limits the potential for HIV to spread in the community.

6  According to AHF the PCH Special Needs Program focuses on a coordinated care model "focused

7  on intensive, highly structured, and rigidly schedule drug regimens."  Declaration of Donna Stidham

8  ¶ 15.  The Nurse Care Manager, which each enrollee is provided under the plan, is tasked with

9  ensuring members "remain adherent to their medication schedules, their provider appoints, and other

10  co-morbid therapies" among other things.  *Id.* ¶ 20.  According to AHF, the care provided under the

11  PHC Special Needs Plan, "results in far higher percentages of Positive Healthcare enrollees

12  achieving viral suppression" where "[a]round 84% of Positive Healthcare special needs plan

13  enrollees achieve viral suppression compared to the national average of 62%."  Declaration of

14  Michael B. Wohlfeiler ¶ 9.  And it is AHF's assertion that the "PHC Special Needs Plan contributes

15  to the overall public health of the County; when PHC enrollees achieve undetectable viral loads of

16  HIV (meaning that current tests cannot detect HIV), they cannot transmit the HIV virus."

17  Declaration of Donna Stidman ¶ 12.  *See Santa Cruz Lesbian and Gay Community Center*, 508 F.

18  Supp. 3d at 547 (recognizing public's interest in "reducing barriers to health care and other critical

19  services for all communities.")

20      Turning to the balance of the equities, the Department argues that granting the injunction would

21  present a "substantial risk of harm" to it and the AHF's Medi-Cal member population, as well as the

22  public at large because it would delay the transition of enrollees to new healthcare plans.  Opp'n at

23  24.  For example, the Department argues that granting the injunction would interfere in the

24  Department's negotiations with a current MCP that is willing to take over enrollees' care.  Opp'n at

25  25.  But this harm would only be realized if the PHC Special Needs Plan is later terminated and the

26  enrollees need to be transitioned to new health care plans, which presumably the Department cannot

27  predict.  And given what the Department has explained, that the transition of enrollees to new plans

28  takes time, this argument seems to cut both ways.

The Department also argues that granting the injunction may also "invite other MCPs to engage in similar conduct—endangering the health care of their members to increase their leverage in contractual negotiations with the Department." Opp'n at 25.   To the extent that granting the injunction means that the members continue to receive care under AHF's PHC Special Needs Plan and only later transition to other plans, it is unclear what AHF has done or is doing to "endanger the health care of their members."  At best, AHF's belated termination notice to the Department last year, which risked members not having transitioned to new providers before the AHF contract ended, endangered the health care of their members.  But that is not what is at issue in this case.  It is therefore difficult to see how the granting of this injunction would encourage other MCPs to belatedly terminate their contracts with the Department—the act which allegedly endangers the health of enrollees.

The Department also points to the practical impact of granting preliminary injunction, which would force it to continue a tumultuous business relationship with AHF that "undermines the Department's broader mission of providing State's Medi-Cal beneficiaries with high quality, accessible, and cost-effective care." Opp'n at 25.  Presumably, the Department has no legitimate interest in violating AHF's constitutional rights and to the extent that this Court ultimately determines that terminating the Contract due to AHF's Nov. 2021 Letter does not violate its constitutional rights, or the Department ultimately terminates its relationship with AHF for a reason other than the letter, it will not necessarily be forced to continue this allegedly tumultuous business relationship for long.

Turning to AHF's harm, as addressed above, not enjoining the Contract would result in the frustration of AHF's mission and goals and deprivation of organizational funding.  AHF also claims that many enrollees stand to lose services unavailable through alternative plans, specifically their Nurse Care Manager.  *See* Declaration of Michael Weinstein ¶¶ 12, 19 ("all PHC enrollees are assigned a specific Registered nurse to serve as their care manager. No other Medi-Cal based program in Los Angeles County provides such a Registered Nurse care manager for all its patients living with AIDS").  While it appears undisputed that the PHC Special Needs plan is the only plan to assign a Registered Nurse Care manager to all enrollees, AHF acknowledges that other Medi-Cal

1   programs provide a similar type of benefit, "referred to in the Medi-Cal system Enhanced Care
2   Management" ("ECM").  Declaration of Michael Weinstein ¶ 23.

3       The Court balances this against the Department's own claim that it has reached an agreement
4   with another MCP who would accept all of the AHF's enrollees into its plan and would be ready to
5   provide covered services to all AHF members on January 1, 2023.  Declaration of Michelle Retke ¶
6   25.  The Department asserts that a preliminary injunction would undo the efforts to transition
7   enrollees to a suitable new plan.  *Id.* ¶ 26–27 ("Granting this motion would not only halt that process
8   but would negate all the work that has been done, and leave AHF's members uncertain of how long
9   their AHF membership will last.")  However, as AHF's counsel highlighted during the hearing, of
10  the 811 enrollees, only 28 will qualify for similar ECM care, leaving the remaining enrollees without
11  a benefit that they had been receiving under the PHC Special Needs Plan expires.  *See* Declaration of
12  Michael Weinstein ¶ 23.  And where a plaintiff has "raised serious First Amendment questions" it
13  "compels the finding . . . that the balance of hardships tips sharply in [Plaintiff's] favor."  *Am.*
14  *Beverage Ass'n*, 916 F.3d at 758.

15      The Court acknowledges the Department's important interest in efficiently overseeing
16  California's Medicaid program, which includes ensuring enrollees are able to transition to a new
17  care plan efficiently.  However, the Court finds AHF has carried its burden in showing that the
18  equities and public interest weigh in favor of granting a preliminary injunction.

19      For the reasons stated above, the Court **GRANTS** AHF's Motion for Preliminary Injunction.
20  The Department, and its representatives, agents, and employees, and all those acting on its behalf, in
21  concert with it, or at its direction, are preliminarily enjoined and restrained for the pendency of this
22  action from relying on AHF's Nov. 2021 Letter in terminating, or refusing to extend or amend, the
23  PHC Special Needs Plan for operation starting January 1, 2023.

24                        **REQUEST FOR STAY PENDING APPEAL**

25      At the hearing, counsel for the Department requested, that should this Court grant AHF's motion
26  for preliminary injunction that the Court consider the Department's request for a stay pending
27  appeal, relying on the same arguments that support their opposition to AHF's request for preliminary
28  injunction.  Also at the hearing, AHF opposed this request.

**I.     Applicable Law**

During "the pendency of an interlocutory appeal" the court "may suspend, modify, restore, or grant an injunction." FED. R. CIV. P. 62(d).  A party requesting a stay pending appeal, "bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion" to stay. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009).  Courts consider "(1) whether the movant has made a strong showing of the likelihood of success on the merits; (2) whether the movant is likely to be irreparably injured absent a stay during the pendency of the appeal; (3) whether a stay will substantially injure other parties; and (4) where the public interest lies." *Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (quoting *Nken*, 556 U.S. at 434).  The first two factors "are the most critical." *Nken*, 556 U.S at 434.  As with the preliminary injunction standard, the factors for "assessing the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

**II.    Discussion**

As it is the Defendants' requesting the stay, they carry the burden in showing that a stay is warranted. *See Nken*, 556 U.S. at 433–34.   The Court acknowledges this case presents unique facts and demands a complex balancing of the parties' interests when determining the likelihood of success on the merits of AHF's First Amendment claims.  However, even if the Court were to assume that Defendants have presented arguments that "at a minimum" shown "a substantial case for relief on the merits" of an appeal, *Leiva-Perez*, 640 F.3d at 967, the Defendants fail to establish that they will irreparably be injured absent a stay, and the other factors do not weigh in favor of a stay. The Department claims that another MCP has agreed to take all enrollees of the PHC Special Needs Plan, but if an injunction is granted, and presumably a stay is not issued, there is "no guarantee" that this MCP will be able to accept all enrollees at this later date.  Declaration of Michelle Retke ¶ 27. However, this harm is speculative and does not show that the Defendants will be irreparably harmed absent a stay. *See Leiva-Perez*, 640 F.3d at 968 (movant mut "show that an irreparable injury is the more probable or likely outcome.")

On the other hand, a stay of the injunction pending an appeal stands to injure not only AHF's interest, but the enrollees who stand to lose Nurse Care Managers, a benefit not guaranteed for

majority of enrollees under other programs.  Moreover, as AHF's counsel acknowledged at the hearing, preliminary relief aims to maintain the status quo because the Contract is set to expire December 31, 2022.  The Court's Order granting preliminary injunction would become moot on that date if a stay were granted.

Finally, as addressed above, the public's interest weighs in favor of granting the preliminary injunction, and thus does not favor a stay of the injunction pending appeal.  Altogether, the court denies the government's request to stay the preliminary injunction.

The Department's request for a stay of the injunction pending appeal is therefore **DENIED.**

## **CONCLUSION**

For the reasons stated above, the Court **GRANTS** AHF's Motion for Preliminary Injunction. The Department, and its representatives, agents, and employees, and all those acting on its behalf, in concert with it, or at its direction, are preliminarily enjoined and restrained for the pendency of this action from relying on AHF's Nov. 2021 Letter in terminating, or refusing to extend or amend, the PHC Special Needs Plan for operation starting January 1, 2023.

The Department's request for a stay of the injunction pending appeal is **DENIED**.

**IT IS SO ORDERED**.

Dated: November 28, 2022

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

41